**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Richmond Division

| | |
|---|---|
| In re:  HEALTH DIAGNOSTIC LABORATORY, INC., *et al.*, <br><br> Debtors.[1] | Case No.: 15-32919-KRH <br> Chapter 11 (Jointly Administered) |
| RICHARD ARROWSMITH AS LIQUIDATING TRUSTEE OF THE HDL LIQUIDATING TRUST, <br><br> Plaintiff, <br><br> v. <br><br> FIRST UNITED METHODIST CHURCH CENTRE, ALABAMA, <br><br> Defendant. | Adv. Pro. No. 22-03023-KRH |

**MEMORANDUM OPINION**

On April 12, 2022, Richard Arrowsmith, in his capacity as the Liquidating Trustee of the HDL Liquidating Trust (the "Liquidating Trustee")[2] initiated the above-captioned adversary proceeding (the "Adversary Proceeding") by filing a *Complaint to Recover Avoidable Transfers* [ECF No. 1] (as amended [ECF No. 12], the "Amended Complaint") in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court") against First United Methodist Church Centre, Alabama (the "Defendant"). The Liquidating Trustee seeks to recover under section 550(a) of Title 11 of the United States Code (the "Bankruptcy Code") the

---

[1] The debtors in these cases are Health Diagnostic Laboratory, Inc., Central Medical Laboratory, LLC, and Integrated Health Leaders, LLC (collectively, the "Debtors").

[2] The Liquidating Trustee was appointed by the *Liquidating Trust Agreement* [ECF No. 5619 at 118-40] and pursuant to the confirmed *Modified Second Amended Plan of Liquidation Proposed by the Debtors* [ECF No. 5619 at 50-113] (the "Plan") in these jointly administered bankruptcy cases (the "Chapter 11 Cases" or the "Cases").

portion of the $1,085,000 that he claims was fraudulently transferred from the bankruptcy estate of the Debtors (the "Bankruptcy Estate") to Robert Bradford Johnson ("Johnson") and then to the Defendant.  The Liquidating Trustee maintains that employing commonly accepted forensic methodologies he can trace between $550,000 and $850,000 of the fraudulently transferred $1,085,000 through various accounts into the Defendant's account.  By its *Answer* [ECF No. 5], as revised by the *Stipulation* [ECF No. 13], the Defendant denied each of the Liquidating Trustee's relevant allegations.

The Court has subject matter jurisdiction over this Adversary Proceeding under 28 U.S.C. §§ 157 and 1334(b) and the General Order of Reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (E), and (O).  Venue is appropriate pursuant to 28 U.S.C. § 1409(a).

The Defendant filed a *Motion for Summary Judgment* [ECF No. 14] and *Memorandum in Support of Motion for Summary Judgment* [ECF No. 15] (collectively, the "Defendant's MSJ"), arguing that the Liquidating Trustee failed to produce evidence sufficient to trace assets of the Bankruptcy Estate to Defendant.  The Liquidating Trustee responded with his own *Liquidating Trustee's Motion for Summary Judgment and Opening Memorandum in Support Thereof* [ECF No. 18] (the "LT MSJ," and collectively with the Defendant's MSJ, the "Summary Judgment Motions").  After the Summary Judgment Motions had been fully briefed, the Court conducted a hearing on August 29, 2023, to consider the arguments of counsel.  Finding that there were material facts in dispute with regard to the tracing of funds, the Court denied the parties' Summary Judgment Motions to that extent, reserving the matter for trial.  The Court found that no material

2

facts were in dispute as to two of the Defendant's affirmative defenses and it granted summary judgment in favor of the Liquidating Trustee as to those defenses.[3]

Trial was conducted on October 17, 2023. The day before the trial began, the parties filed extensive *Agreed Stipulations of Fact* [ECF No. 82] (the "Stipulation"). The facts involved in these Chapter 11 Cases have been well documented in the litigation that ensued throughout the Fourth Circuit since the company's business imploded. *See, e.g.*, *United States v. Mallory*, 988 F.3d 730 (4th Cir. 2021); *Arrowsmith v. Warnick* (*In re Health Diagnostic Lab'y, Inc.*), Adv. Pro. No. 17-04300, 2018 WL 4676339, 2018 Bankr. LEXIS 2953 (Bankr. E.D. Va. Sept. 27, 2018); *United States ex rel. Lutz v. Berkeley HeartLab, Inc.*, Civil Action No. 9:14-230-RMG, 2017 WL 5033652, 2017 U.S. Dist. LEXIS 179876 (D.S.C. Oct. 31, 2017). Consequently, many of the facts in this Adversary Proceeding are not in dispute.

Health Diagnostic Laboratory, Inc. ("HDL") was formed as a start-up laboratory in Richmond, Virginia, offering a panel of blood tests for early detection of cardiovascular disease, diabetes, and related illnesses. Stipulation ¶ 1, ECF No. 82 at 2. Johnson was a shareholder of

---

[3] The Court determined that the Defendant was not a mere conduit of Johnson. An entity who "(1) [has] legal dominion and control over the property . . . and (2) exercise[s] this legal dominion and control" is an initial, immediate, or mediate transferee and not a mere conduit. *Guttman v. Constr. Program Grp.* (*In re Railworks Corp.*), 760 F.3d 398, 403 (4th Cir. 2014) (citing *Grayson Consulting, Inc. v. Wachovia Sec., LLC* (*In re Derivium Cap. LLC*), 716 F.3d 355, 362 (4th Cir. 2013)); *see Bowers v. Atl. Motor Speedway, Inc.* (*In re Se. Hotel Props. Ltd. P'ship*), 99 F.3d 151, 155 (4th Cir. 1996). Although the Defendant had received general instructions as to how the money should be spent, it was under no legal obligation to do so. The Defendant did not segregate the money. *See Ruby v. Ryan* (*In re Ryan*), 472 B.R. 714, 728-29 (Bankr. E.D. Va. 2012) (concluding that the defendants had dominion and control over amounts transferred to accounts maintained by the defendants). Johnson testified that he did not ask the Defendant for an accounting as to how it used the donations, and that other than fraud or crime, anything the Defendant did with the funds would have been acceptable to him. *See* Johnson Dep. 23:23-24:21, 24:16-21, ECF No. 18 at 55-56. The Defendant had complete discretion to determine the manner in which the Donations were to be used. *See* Trial Tr. 74:11-74:25, ECF No. 86 at 74. In some instances, the Defendant invested the donations in new equipment and upgrades for its own benefit. Trial Tr. 95:13-98:1, ECF No. 86 at 95-98. The Court concluded that the Defendant did not operate as a pass-through entity such as a bank or other financial institution might.

For the reasons set forth at pp. 14-15 *infra*, the Court also found that Johnson did not receive value in exchange for the charitable donations he gave. The Court concluded that value had to be tangible and that the value had to be given by the transferee to the transferrer.

HDL. *Id.* ¶ 4, ECF No. 82 at 2. He was a principal and insider of HDL's exclusive sales agent and marketing consultant, BlueWave Healthcare Consultants, Inc. ("BlueWave"). *Id.* The Liquidating Trustee obtained a final non-appealable judgment against BlueWave in the amount of $220,336,247.91 (the "Avoided Transfers"), on account of BlueWave's receipt of fraudulent transfers from HDL. *Id* ¶¶ 5, 7, ECF No. 82 at 2-4; *see also Arrowsmith v. Mallory* (*In re Health Diagnostic Lab'y, Inc.*), Adv. Pro. No. 16-3271-KRH, 2021 WL 4099012, 2021 U.S. Dist. LEXIS 170582, at *2 (E.D. Va. Sep. 8, 2021).

On June 8, 2018, Johnson and several of his business entities filed a petition for relief under Chapter 11 of the Bankruptcy Code in the Northern District of Alabama, commencing Case No. 18-02395-TOM11. Stipulation at ¶ 6, ECF No. 82 at 4. Although Johnson had received a portion of the Avoided Transfers and other transfers directly from HDL, the Liquidating Trustee's action against Johnson was stayed by the commencement of Johnson's individual bankruptcy case. *See id.*; 11 U.S.C. § 362. The Defendant has stipulated that transfers in the amount of $1,719,200.61 that HDL made to Johnson are avoidable under sections 548 and 550(a) of the Bankruptcy Code (the "Avoidable Transfers"). Stipulation at ¶ 8, ECF No. 82 at 4; *see* LT MSJ Ex. 2 at 10:18-11:9, ECF No. 18 at 42-43 [hereinafter Johnson Dep.].

Section 550(a) of the Bankruptcy Code provides, in pertinent part, that "to the extent that a transfer is avoided under sections 544, 545, 547, 548, 549, 553(b), or 724(a) of [the Bankruptcy Code], the trustee may recover, for the benefit of the estate, the property transferred . . . from the initial transferee of such transfer . . . or any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a).[4] Section 550 of the Bankruptcy Code provides a mechanism by

---

[4] Section 550 requires that each transfer be avoidable; it does not require that each transfer be formally avoided. *See Sec. Inv'r Prot. SIPA Liquidation Corp. v. Bernard L. Madoff Inv. Sec. LLC* (*In re Madoff*), 480 B.R. 501, 520 (Bankr. S.D.N.Y. 2012) ("Section 550 requires a transfer be avoidable; it does not require a trustee to litigate a final judgment of avoidance against initial transferees before seeking recovery from subsequent transferees.");

4

which the bankruptcy estate can be returned to the position in which would have been but for the avoided transfer.  *Tavenner v. Smoot* (*In re Smoot*), 265 B.R. 128, 139 (Bankr. E.D. Va. 1999) ("The intent [of section 550] is to restore the estate to the financial condition it would have enjoyed had the transfer not occurred." (citing *Aero-Fastener, Inc. v. Sierracin Corp.* (*In re Aero-Fastener, Inc.*), 177 B.R. 120, 139 (Bankr. D. Mass. 1994))); *see also Anderson v. Bennett- Smith* (*In re Bennett*), Adv. Pro. No. 20-02012, 2021 WL 666339, at *3, 2021 Bankr. LEXIS 381, at *8 (Bankr. M.D.N.C. Feb. 19, 2021*); Bargeski v. Rose,* No. RWT 05-0962, 2006 WL 1238742, at *6 (D. Md. Mar. 31, 2006), 2006 U.S. Dist. LEXIS 29059, at *20 (D. Md. Mar. 30, 2006), *aff'd*, 242 F. App'x 945 (4th Cir. 2007) (per curiam).  The Court finds that the initial transfers from HDL to BlueWave or Johnson, i.e., both the Avoided Transfers and the Avoidable Transfers, were fraudulent and avoidable for purposes of section 550 liability.  *See also* Stipulation ¶ 8, ECF No. 82 at 4 (acknowledging that the transfers are avoidable).

The Defendant received a total of $1,085,000 from Johnson (the "Donations").  Stipulation ¶ 10, ECF No. 82 at 4.  The Donations had come out of accounts that contained funds that had been commingled with the Avoided and Avoidable Transfers, as more fully described below.

At trial, Lisa Collura was called to testify as an expert witness in the field of forensic accounting and tracing.[5]  Ms. Collura testified that tracing is employed to follow the flow of money in and out of bank accounts.  Trial Tr. 16:18-20, ECF No. 86 at 16.  In cases where a bank account has multiple sources of funds, tracing methodologies must be applied to the activity in a

---

*Kelley v. Stapleton* (*In re Petters Co.*), No. 08-45257, 2018 Bankr. LEXIS 119, at *15-17 (Bankr. D. Minn. Jan. 17, 2018); 5 Collier on Bankruptcy ¶ 550.02 (16th 2023).  Here, Johnson's Chapter 11 bankruptcy filing prevented the Liquidating Trustee from obtaining an order avoiding the transfers from HDL to Johnson.  However, for the same reasons that the transfers from HDL to BlueWave (the Avoided Transfers) were avoided, the transfers from HDL to Johnson (the Avoidable Transfers) are avoidable pursuant to sections 544 and 548 of the Bankruptcy Code and the Defendant has so stipulated.  *See* Stipulation ¶¶ 8-9, ECF No. 82 at 4.

[5]   The Defendant stipulated to the expert's qualification. *See* Trial Tr. 15:23-16:13, ECF No. 86 at 15-16.

commingled account in order to trace particular funds through the account so that an outflow of funds can be attributable to a particular source of funds. *Id.* 16:20-25, ECF No. 86 at 16. Ms. Collura was asked to trace HDL funds through a number of bank accounts to determine the amount of HDL funds that went to the Defendant. Pl.'s Ex. 1 ¶ 12, ECF No. 48 at 5 [hereinafter Collura Report]. Ms. Collura examined the bank records and bank statements for each account on a transaction-by-transaction basis to determine the sources and uses of funds. *Id.* ¶ 14, ECF No. 48 at 6. Ms. Collura determined that the $1,085,000 in Donations that the Defendant received from Johnson flowed through the four bank accounts listed below:

**FIGURE 1**
**List of BlueWave and Johnson Accounts**

| Account Holder | Banking Institution | Account # | Months of Available Bank Statements |
|---|---|---|---|
| BlueWave Healthcare Consultants, Inc. | Superior/Cadence [2] | xxxxxx4230 | Nov 2009 – Mar 2016 |
| Robert B. Johnson | Alabama Credit Union | xxx37-00 | Feb 2011 – Sep 2016 |
| Robert B. Johnson | Alabama Credit Union | xxx37-40 | Feb 2011 – Mar 2018 |
| R Brad Johnson | Superior/Cadence [2] | xxxxxx4586 | Dec 2009 – Dec 2018 [3] |

*Id.* ¶ 15 fig.1, ECF No. 48 at 7 (the foregoing accounts, the "BlueWave Account," the "Johnson Alabama Credit Union Savings Account", the "Johnson Alabama Credit Union Money Market Account" and the "Johnson Cadence Account").[6]

Each of these accounts had received HDL funds either directly from HDL or indirectly from HDL through one of the other three accounts. *Id.* ¶ 16, ECF No. 48 at 7. Specifically, out of $257 million in total inflows, the BlueWave Account received approximately $220 million of HDL funds between November 2009 and March 2016. *Id.* ¶ 20, ECF No. 48 at 9. The Johnson Alabama

---

[6] The parties stipulated that the excel reports attached to the Collura Report as Exhibit 3, Exhibit 4, Exhibit 5, and Exhibit 6 were true and accurate summaries of the bank records for these four accounts. Stipulation ¶ 12, ECF No. 82 at 5.

Credit Union Savings Account had total inflows of $553,000 between February 2011 and September 2016, including $316,000 of funds from the BlueWave Account, which received funds directly from HDL. *Id.* ¶ 21, ECF No. 48 at 9. Between February 2011 and March 2018, there was a total of approximately $31 million of inflows into the Johnson Alabama Credit Union Money Market Account, including $139,000 directly from HDL and $27 million from the BlueWave Account, which received funds directly from HDL. *Id.* ¶ 22, ECF No. 48 at 10. Lastly, there was a total of approximately $43 million of inflows into the Johnson Cadence Account between December 2009 and December 2018. *Id.* ¶ 23, ECF No. 48 at 10. These inflows included $1.5 million directly from HDL. *Id.* They also included over $25 million that came from the BlueWave Account and over $4 million that came from the Johnson Alabama Credit Union Money Market Account, both of which accounts had received funds directly from HDL. *Id.*

Based on her review of the bank records and the chronological listings of transactions in these four accounts, Ms. Collura was able to identify a total of $1,085,000 in transfers to the Defendant from the Johnson Cadence Account. *Id.* ¶ 27, ECF No. 48 at 12.



FIGURE 6
Pathways of Transfers of HDL Funds to the Defendant

*Id.* ¶ 27 fig. 6, ECF No. 48 at 12.  However, there were sources of funds from other than HDL also in the accounts.  *Id.* ¶ 18, ECF No. 48 at 8.  As the four accounts were commingled, Ms. Collura applied the Lowest Intermediate Balance Rule ("LIBR") as well as the Restated Tracing Rules to the transactional data derived from the bank records for the four accounts to trace the subsequent transfers of HDL funds to the Defendant.  *Id.* ¶ 26, ECF No. 48 at 11-12.

*Lowest Intermediate Balance Rule*

As Ms. Collura explained, LIBR is a method of tracing that assumes that trust or secured funds deposited into a commingled bank account are the last funds disbursed from that account, and any disbursements made from the account are taken first from funds other than the trust or secured funds until the balance in the account dips below the amount of those trust or secured funds.  *Id.* ¶ 29, ECF No. 48 at 13.  In other words, in her analysis, Ms. Collura assumed that all non-HDL funds had to be exhausted (i.e., the balance in the BlueWave and Johnson Accounts had to fall below the amount of the HDL funds that had flowed into the account) prior to disbursement of HDL funds.  *Id.* ¶ 30, ECF No. 48 at 13.  Using LIBR, Ms. Collura identified $569,435 in subsequent transfers of HDL funds to the Defendant.  *Id.* ¶ 31 & Ex. 7.4, ECF Nos. 48 at 13, 49 at 108.

*Restated Tracing Rules*

Section 59 of the *Restatement (Third) of Restitution and Unjust Enrichment* provides for Restated Tracing Rules.  Restatement (Third) of Restitution & Unjust Enrichment § 59(2) & cmts. a, d & illus. 4-6 (Am. Law. Inst. 2011).  Under this methodology, Ms. Collura explained,

> withdrawals from a commingled bank account can be "marshaled so far as possible in favor of the claimant" (here, the Trustee), and the claimant can "claim the entire advantage of beneficial withdrawals that can be attributed to the claimant's funds" (i.e., HDL funds). Further, the claimant can trace to his benefit any withdrawal from the commingled bank account that does not exceed the lowest

8

> balance reached in that commingled account between 1) the point at which the Trustee's funds (i.e., HDL funds) are deposited into the commingled bank account and 2) the point at which the withdrawal is made.

Collura Report ¶ 33, ECF No. 48 at 14. Using the Restated Tracing Rules, Ms. Collura identified $845,015 in subsequent transfers of HDL funds to the Defendant. *Id.* ¶ 34 & Ex. 7.4, ECF Nos. 48 at 14, 49 at 108.

The transfer-by-transfer summary of results under each tracing method, as set forth in the Collura Report, is as follows:

| Transfer Date | Amount | LIBR | Restated Tracing |
|---|---|---|---|
| 11/15/2012 | $ 25,000.00 | $ 24,846.00 | $ 25,000.00 |
| 11/27/2012 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 |
| 12/21/2012 | $ 200,000.00 | $ 200,000.00 | $ 200,000.00 |
| 01/02/2014 | $ 50,000.00 | $ 50,000.00 | $ 50,000.00 |
| 12/23/2014 | $ 200,000.00 | $ 200,000.00 | $ 200,000.00 |
| 12/17/2015 | $ 200,000.00 | $ 0.00 | $ 160,015.00 |
| 12/19/2016 | $ 200,000.00 | $ 101,799.00 | $ 200,000.00 |
| 12/26/2017 | $ 200,000.00 | $ 0.00 | $ 0.00 |
| | $ 1,085,000.00 | $ 569,435.00 | $ 845,015.00 |

Collura Report Ex. 7.4, ECF No. 49 at 108.

The Defendant did not dispute the calculations set forth in the Collura Report at trial. Rather, the Defendant argued that the Liquidating Trustee should have used a different method of tracing than the two presented by Ms. Collura. Specifically, the Defendant maintains that that the Liquidating Trustee is required to apply the tracing method that is most favorable to the Defendant.[7] The Defendant does not explain what that tracing methodology should be; instead, the Defendant only suggests that a different methodology could have been used.

---

[7] Ms. Collura admitted that other tracing methods could have been used. She identified examples of three other methods that have been accepted by courts: the last in, first out method ("LIFO"); the first in, first out method ("FIFO"); and the pro rata method. Trial Tr. 19:4-20:9, ECF No. 86 at 19-20. Ms. Collura was instructed by the Liquidating Trustee to use the Lowest Intermediate Balance Rule and the Restated Tracing Rules. Collura Report ¶ 12, ECF No. 48 at 5. Ms. Collura testified that the Restated Tracing Rules generally produces a result that is more favorable to the party whose funds are being traced (in this case, the Liquidating Trustee), while LIBR is

9

The Liquidating Trustee was not obligated to present his case in the light most favorable to Defendant.[8] Nor does section 550 of the Bankruptcy Code require a plaintiff to present every conceivable method of tracing possible. The Defendant had access to all of the documents upon which the Liquidating Trustee's expert relied. If the Defendant believed a different tracing methodology was appropriate, it should have presented its own analysis by presenting evidence at trial. The Defendant chose not to offer a rebuttal expert report.

Courts have wide discretion to employ the tracing method that is most appropriate under the circumstances. *United States v. Henshaw*, 388 F.3d 738, 741 (10th Cir. 2004) ("[C]ourts exercise case-specific judgment to select the [tracing] method best suited to achieve a fair and equitable result on the facts before them." (citation omitted)); *Picard v. Charles Ellerin Revocable Tr.* (*In re Bernard L. Madoff Inv. Sec. LLC*), No. 08-01789 (BRL), 2012 WL 892514, at *3 n.7, 2012 Bankr. LEXIS 1088, at *8 n.7 (Bankr. S.D.N.Y. Mar. 14, 2012) ("Courts have broad discretion to determine which monies of comingled funds derive from fraudulent sources." (citations omitted)). To determine the appropriate tracing methodology in a given case, courts consider, among other things, the purpose of the statute under which the movant proceeds, the ultimate result, and the purpose and methodology of the proposed tracing method. *Cf. In re Maine*, 461 B.R. 723, 731-34 (Bankr. S.D. Ohio 2011). While the Court has broad discretion in selecting the tracing methodology to employ, its decision must ultimately be based on evidence

---

somewhat the opposite. Trial Tr. 20:18-21:7, ECF No. 86 at 20-21. HDL funds are traced to outflows only when there are no other sources of funds available in the account. *Id.* 21:2-7, ECF No. 86 at 21. So the LIBR, she concluded, would typically generate the lowest result to the party whose funds are being traced. *Id.* 21:8-16, ECF No. 86 at 21.

[8] Consistent with his duty to properly manage estate assets, *see In re Comput. Learning Ctrs., Inc.*, 272 B.R. 897, 905 (Bank. E. D. Va. 2001), the Liquidating Trustee testified, and the Court so finds, that he did not employ more than two tracing methodologies because he was dealing with a very finite amount of resources and he was trying to run the case as efficiently possible. Trial Tr. 56:12-22, ECF No. 86 at 56.

of record. *See, e.g.*, *id.*; *Watts v. MTC Dev., LLC (In re Palisades at W. Paces Imaging Ctr., LLC)*, 501 B.R. 896, 917-22 (Bankr. N.D. Ga. 2013). In the case at bar, the Liquidating Trustee has presented unrebutted and undisputed evidence that traces the Donations received by the Defendant back to HDL.

LIBR is a well-established and widely accepted method of equitable tracing. *See, e.g.*, *In re Palisades at W. Paces Imaging Ctr., LLC*, 501 B.R. at 917 (using the lowest intermediate balance test in the context of section 550); *In re A'Hearn*, No. 11- 00615, 2012 WL 1378467, at *5, 2012 Bankr. LEXIS 1761, at *12-14 (Bankr. N.D. Iowa Apr. 19, 2012). LIBR is a method that has been accepted by the Fourth Circuit and one that this Court has applied in prior cases.

> The Lowest Intermediate Balance Rule originated in trust law as a rule to determine the rights of a trust beneficiary to a trustee's bank account where the trust funds and the trustee's personal funds are commingled. In this regard, the Rule assumes that the funds at issue remain in the account and are available to be traced provided that the balance does not fall below the amount of the disputed funds. In the event that "the balance of the account dips below the amount of [funds at issue], [the funds at issue] abate[ ] accordingly.

*United States v. Miller*, 295 F.Supp.3d 690, 703-04 (E.D. Va. 2018), *aff'd*, 911 F.3d 229 (4th Cir. 2018) (alterations in original) (internal citations omitted);[9] *see also Old Republic Nat'l Title Ins. Co. v. Tyler (In re Dameron)*, 155 F.3d 718, 723-24 (4th Cir. 1998); *Sony Corp. v. Bank One, W.*

---

[9]  The LIBR has roots in English common law as noted by the Supreme Court in the *Cunningham* case:

> The courts below relied on the rule established by the English Court of Appeals in Knatchbull v. Hallett, L. R. 13 Ch. D. 696, in which it was decided by Sir George Jessel, Master of the Rolls, and one of his colleagues, that, where a fund was composed partly of a defrauded claimant's money and partly of that of the wrongdoer, it would be presumed that in the fluctuations of the fund it was the wrongdoer's purpose to draw out the money he could legally and honestly use rather than that of the claimant, and that the claimant might identify what remained as his res, and assert his right to it by way of an equitable lien on the whole fund, or a proper pro rata share of it.

*Cunningham v. Brown*, 265 US 1, 12 (1924) (citing *Nat'l Bank v. Ins. Co.*, 104 US 54, 68 (1881); *Hewitt v. Hayes*, 205 Mass. 356, 91 N.E. 332 (1910)).

11

*Va., Huntington NA*, 85 F.3d 131, 139-41 (4th Cir. 1996); *Frontier Pepper's Ferry, LLC v. LandAmerica 1031 Exch. Servs.* (*In re LandAmerica Fin. Grp., Inc.*), Nos. 08-35994-KRH, 08-03148, 08-03171, 09-03023, 2009 WL 1269578, at *12, 2009 Bankr. LEXIS 4133, at *37 (Bankr. E.D. Va. May 7, 2009). The LIBR method assumes that "clean" funds exit the account before the "dirty" funds until the "clean" funds balance is reduced to zero, at which point, withdrawals are necessarily made from "dirty" funds. *In re Dameron*, 155 F.3d at 724; *see United States v. Miller*, 911 F.3d 229, 234-35 (4th Cir. 2018) (affirming district court's finding of probable cause where the government's tracing analysis under the LIBR method showed that the assets were traceable to laundered funds); *see also In re Maine*, 461 B.R. at 730-34 (applying the LIBR to determine exempt amounts in the debtor's bank account because of, among other things, the policy of construing exemptions in the debtor's favor and "under the LIB[R], withdrawals will be charged first to the non-exempt funds, thus aiding the debtor's fresh start"); *Off. Comm. of Unsecured Creditors v. Catholic Diocese of Wilmington, Inc.* (*In re Catholic Diocese of Wilmington, Inc.*), 432 B.R. 135, 151 (Bankr. D. Del. 2010).[10]

Taking into consideration the purpose of section 550 of the Bankruptcy Code, the ultimate result in this Adversary Proceeding and these Chapter 11 Cases, the purposes of the two tracing

---

[10] Under the LIBR, the transferee "withdraws non-trust funds first, thus maintaining as much of the trust's funds as possible." *In re Dameron*, 155 F.3d at 724. When the commingled fund is "reduced 'below the level of the trust fund but not depleted, the claimant is entitled to the lowest intermediate balance in the account.'" *Id*. (quoting *Conn. Gen. Life Ins. v. Universal Ins. Co.*, 838 F.2d 612, 619 (1st Cir. 1988)). But the LIBR also allows for discretion and flexibility. "[T]he [LIBR], quite apart from being a rigid rule requiring that fraud funds are always the last to leave an account, aims to 'preserve[ ] the proceeds to the greatest extent possible as the account is depleted.'" *Miller*, 295 F.Supp.3d at 705 (quoting *Sony Corp.*, 85 F.3d at 139).

By contrast, the Restated Tracing Rules provides that when "property of the claimant has been commingled by a recipient who is a conscious wrongdoer . . . [w]ithdrawals that yield a traceable product and withdrawals that are dissipated are marshaled so far as possible in favor of the claimant." Restatement (Third) of Restitution & Unjust Enrichment § 59(2) (Am. Law. Inst. 2011). When the property in question is commingled by an innocent recipient, "restitution from property so identified may not exceed the amount for which the recipient is liable by [certain other rules]." *Id*. § 59(3). While there are very few cases discussing the Restated Tracing Rules, this method appears to incorporate elements of the LIBR and apply an element of scienter to the transferee.

12

methods applied by Ms. Collura, and Fourth Circuit precedent, the Court in the exercise of its discretion selects the Lowest Intermediate Balance Rule as the method best suited to trace the funds in this case. The Court finds that the Liquidating Trustee has established through tracing that the Defendant is the mediate transferee of the initial transferees BlueWave (in the case of the Avoided Transfers) and Johnson (in the case of the Avoidable Transfers). The unrefuted Collura Report demonstrates under the Lowest Intermediate Balance Rule that the Defendant received funds in the amount of $569,435 that are directly traceable to the Avoided Transfers and/or Avoidable Transfers.[11]

While "[a] trustee has an absolute right to recover from the initial transferee," *Goldman v. Capital City Mortg. Corp.* (*In re Nieves*), 648 F.3d 232, 237 (4th Cir. 2011); *see Ballantyne Brands, LLC v. Weisehan* (*In re Ballantyne Brands, LLC*), Nos. 19-30083, 21-03002, 21-03004, 21-03005, 2023 WL 6397107, at *32, 2023 Bankr. LEXIS 2435, at *89 (Bankr. W.D.N.C. Oct. 2, 2023) ("Initial transferees are strictly liable for the transfer received."), a trustee is precluded from recovering against a mediate "transferee that takes for value, . . . in good faith, and without knowledge of the voidability of the transfer avoided" 11 U.S.C. § 550(b)(1). The burden of proving this affirmative defense lies with Defendant.

The only element of this defense with which the Liquidating Trustee took issue was whether Defendant gave value in exchange for the Donations. The Defendant bears the burden of

---

[11] The Liquidating Trustee testified that the Estate is also entitled to recover a $200,000 donation that Johnson made to the Defendant in 2015. Trial Tr. 56:23-57:18, ECF No. 86 at 57-58. On December 14, 2015, Johnson deposited $346,263 into his Cadence Account. Collura Report Ex. 6, ECF No. 49 at 35; Pl.'s Ex. 4K, ECF No. 74-7 at 189. The deposited funds came from a tax refund. Collura Report Ex. 6, ECF No. 49 at 35. The next day, on December 15, 2015, Johnson issued a check from the Cadence Account to Defendant for $200,000. Collura Report Ex. 6, ECF No. 49 at 35; Pl.'s Ex. 4M, ECF No. 74-7 at 190. The Liquidating Trustee demonstrated that the tax refund derived from income Johnson received from BlueWave. The Liquidating Trustee testified that common sense makes clear that the $200,000 is part of the Avoided Transfers. Trial Tr. 56:23-57:18, ECF No. 86 at 57-58. However, the Liquidating Trustee's own expert testified at trial that she did not include the tax refund in her tracing analysis. Trial Tr. 41:2-13, ECF No. 86 at 42. Accordingly, the Court declines to include the tax refund.

proving that it gave value. *In re Nieves*, 648 F.3d at 237 ("[O]nce the plaintiff has established that a party is an immediate or mediate transferee of the initial transferee, a defendant claiming a defense to liability under § 550(b) bears the burden of proof." (alteration in original) (quoting *In re Smoot*, 265 B.R. at 140)).

Courts have defined the term "value" as used in section 550 of the Bankruptcy Code differently. *See Brown v. Harris* (*In re Auxano, Inc.*), 96 B.R. 957, 965 (Bankr. W.D. Mo. 1989) (requiring fair market value); *Rodgers v. Monaghan Co.* (*In re Laguna Beach Motors*), 159 B.R. 562, 568 (Bankr. C.D. Cal. 1993) (incorporating the definition of "value" under section 548, meaning reasonably equivalent value, to section 550); *Redmond v. Brooke Holdings, Inc.* (*In re Brooke Corp.*), 515 B.R. 632, 640-41 (Bankr. D. Kan. 2014) (requiring only the consideration necessary to form a contract); *Anderson v. Suntrust Mortg., Inc.* (*In re Judd*), 471 B.R. 830, 847 (D.S.C. 2012) (same). While their definitions of value may vary, the courts do all agree that the value must be tangible.[12]

The evidence was unconverted that the Defendant gave nothing of any quantifiable value to Johnson in exchange for the Donations it received. For each year in which Johnson made Donations, the Defendant issued a document stating: "Pursuant to Internal Revenue Code requirements for substantiation of charitable contributions, no goods or services were provided in return for the Tax Deductible contributions." LT MSJ Ex. 4 at 55:21-57:11, 58:7-60:4, ECF No. 18 at 144-46, 147-49. Johnson deducted the Donations on his tax returns as gifts to charity. *See, e.g.*, Pl.'s Ex. 5, ECF No. 75-7 at 137-38, ECF No. 75-8 at 101; ECF No. 75-11 at 50; ECF No. 75-12 at 6, 135, 171; ECF No. 75-13 at 101, 137-38, 202, 231; ECF No. 75-14 at 100-01, 212.

---

[12] "Value" as defined by section 548 of the Bankruptcy Code "means property, or the satisfaction or securing of a present or antecedent debt . . . ." 11 U.S.C. § 548(d)(2)(A).

14

Instead, the Defendant asserted that the value Johnson received was the intangible emotional benefits of charitable giving. The Defendant claimed that Johnson received positive, altruistic feelings in exchange for performing good works. The Court holds that value under section 550(b) requires the receipt of a quantifiable economic benefit. Positive, altruistic feelings are not value for purposes of section 550 of the Bankruptcy Code.

Alternatively, the Defendant argued that the members of its congregation provided value by contributing their time and effort toward the charitable events the church was able to conduct. The Defendant suggests that because its members performed charitable acts without seeking compensation, the members gave up value in exchange for the Donations. This argument fails because the value transferred in a section 550(a) action must inure to the benefit of the transferor. *Bonded Fin. Servs., Inc., v. Eur. Am. Bank*, 838 F.2d 890, 897 (7th Cir. 1988) (Value means "what the transferee gave up [to the transferor] rather than what the debtor received" because "[t]ransferees and other purchasers generally deal only with the previous person in line; they give value, if at all, to their transferors."). The Court finds that the Defendant did not meet its burden of proving it took the donations "for value."

Finally, the Defendant advanced an affirmative defense separate from that provided in the Bankruptcy Code. The Defendant attempts to avail itself of the "changed circumstances defense" set forth section 65 of the *Restatement (Third) of Restitution and Unjust Enrichment*. That section provides: "[i]f receipt of a benefit has led a recipient without notice to change position in such manner that an obligation to make restitution of the original benefit would be inequitable to the recipient, the recipient's liability in restitution is to that extent reduced." Restatement (Third) of Restitution & Unjust Enrichment § 65 (Am. Law. Inst. 2011).

The Defendant convincingly demonstrated at trial that it spent nearly all the Donations it received from Johnson to further its charitable and religious missions for the benefit of the community. The Defendant sponsored programs such as "Christmas Miracle Workshops,"[13] "Thanksliving" events[14], and "Back to School Bashes."[15] At the time the Defendant received a demand from the Liquidating Trustee, there was only $227,084.56 of the Donations it had received remaining. Stipulation ¶ 23, ECF No. 82 at 7. The Defendant contends that it was an innocent recipient of the Donations which it put to good use. The Defendant argues that given the changed circumstances, it would be inequitable to now require it to repay more than what it had remaining of the money it had received from Johnson.

As unfortunate as the facts in this case may be, the defense of changed circumstances is simply not available to the Defendant. This is not a case of unjust enrichment. Section 550 is concerned with returning fraudulently transferred property to the estate; it does not consider the potential hardship to, or the particular circumstances of, a subsequent transferee. *See Scholes v. Lehmann*, 56 F.3d 750, 761 (7th Cir. 1995) ("The statute makes no distinction among different kinds of recipient of fraudulent conveyances. Every kind is potentially liable.").

The only defense that Congress provided to an action asserted under section 550(a) of the Bankruptcy Code is that set forth in section 550(b). Congress undoubtedly considered the

---

[13] The Defendant estimated that hundreds of volunteers served over 700 people in need by providing toys and clothing, non-perishable food items, and space heaters to children and families. Def.'s Ex. L, ECF No. 46 at 36; *see also* Def.'s Exs. Y&Z; Def.'s Ex. N, ECF No. 46 at 41; Def.'s Ex. P, ECF No. 46 at 45; Def.'s Ex. O, ECF No. 46 at 47.

[14] The Defendant hosted holiday meals for individuals and families and also providing meal kits so that families could share holiday meals in their own homes. Def.'s Exs. W & X; *see also* Def.'s Ex. N, ECF No. 46 at 42.

[15] The Defendant provided school supplies such as hundreds of backpacks, notebooks, pens, and pencils for attendees. Def.'s Exs. U & V; *see also* Def.'s Ex. O, ECF No. 46 at 43; *see also* Def.'s Ex. M, ECF No. 46 at 39; Def.'s Ex. R, ECF No. 46 at 49; Def.'s Ex. T, ECF No. 46 at 54.

equitable ramifications of permitting recovery from a subsequent transferee, and only carved out a defense for a transferee who has taken in good faith and for value.[16] *See Bowers v. Atlanta Motor Speedway* (*In re Se. Hotel Props. Ltd. P'shp*), 99 F.3d 151, 157 (4th Cir. 1996) (noting in the context of recovery of post-petition transfers that "[t]here is almost always some injustice or hardship . . . because the loss must fall either upon the third person or upon the creditors of the bankrupt. Whether the line which has been drawn is the best possible solution of the problem is not for the courts to say." (quoting *Lake v. N.Y. Life Ins. Co.,* 218 F.2d 394, 399 (4th Cir. 1955))); *Teston v. Univ. Sys. of Md.* (*In re Teston*), 646 B.R. 417, 426-27 (Bankr. D. Md. 2022) ("[D]ecisions as to who should bear the loss incurred by a post-petition transfer are made in the Code. The rationale applies equally to pre-petition avoidance actions." (internal citations and quotations omitted)); *Richardson v. United States* (*In re Anton Noll, Inc.*), 277 B.R. 875, 882 (B.A.P. 1st Cir. 2002) ("Congress has 'made its own judgment of who should bear the risk of loss in enacting § 550.'" (quoting *Rupp v. Markgraf*, 95 F.3d 936, 944 (10th Cir. 1996))).

The Defendant argues that to the extent the Liquidating Trustee is able to use the equitable remedy of tracing, the Defendant should be able to use equitable defense of "changed circumstances."[17] But this Court is not at liberty to invoke equity just because the Defendant presents a compelling circumstance.

---

[16] Congress made certain exceptions for the avoidance of charitable contributions as fraudulent conveyances under section 548 of the Bankruptcy Code, but it made no such provision for actions to recover under section 550 of the Bankruptcy Code. *Compare* 11 U.S.C § 548(a)(2) ("A transfer of a charitable contribution . . . shall not be considered to be a transfer covered under [section 548(a)](1)(B) . . . ."). *with id.* § 550(a) ("[T]he trustee may recover . . . property transferred . . . from – (2) *any* immediate or mediate transferee . . . ." (emphasis added)).

[17] Tracing is not an equitable *remedy*. Tracing is a *tool* used by analysts of financial fraud to identify the recipients of transferred property by following the flow of funds transferred from one account to the next. *See United States v. Henshaw*, 388 F.3d 738, 741 (10th Cir. 2004) (tracing is "an equitable substitute for the impossibility of specific identification" of fraudulently transferred assets that are commingled (citation omitted)).

"When a federal statute enumerates defenses to liability, without specifying that other unenumerated defenses are available, the enumerated statutory defenses are generally deemed to be the exclusive defenses available under the statute." *United States v. Barlow*, 576 F. Supp. 2d 1375, 1381-82 (S.D. Fla. 2008) (citations omitted). The "equitable powers remain[ing] in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." *Law v. Siegel*, 571 U.S. 415, 421 (2014) (internal citation omitted). Where the Bankruptcy Code has enumerated a defense, a bankruptcy court cannot create a new defense not otherwise provided when that defense would contradict the Code. *See McColley v. M. Fabrikant & Sons, Inc. (In re Candor Diamond Corp.)*, 26 B.R. 850, 851-52 (Bankr. S.D.N.Y. 1983) (the court does not have the "equitable power to 'judicially create' an exception that is not set forth in [section 547(c) of the Bankruptcy Code]").

Applying the changed circumstances defense in the case at bar would require the Court to ignore the "value" requirement set forth in section 550(b). That section of the statute requires a transferee to take (1) "for value," (2) "in good faith," *and* (3) "without knowledge of the voidability of the transfer." 11 U.S.C. § 550(b)(1). A transferee only satisfies the section 550(b) defense when all three elements are met. The changed circumstances defense, on the other hand, would transform the conjunctive word "and" into the disjunctive word "or." Such an interpretation expressly contradicts the statute. While the Court does have the power under section 105(a) to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [title 11]," 11 U.S.C. § 105(a), *Siegel* makes clear that the Court may not do so in order to effect a work-around to circumvent the express language of the Bankruptcy Code, 571 U.S. at 421. While the Defendant may have taken the Donations in good faith and done great work in the community of Centre, Alabama, by feeding the hungry, by providing children with school supplies, and by

18

sponsoring holiday celebrations, "*Law v. Siegel* teaches us that the Court can't simply carry out what seems fair, when faced with a statutory imperative . . . to the contrary." *In re Criscuolo*, Case No. 09-14063-BFK, 2014 WL 1910078, at *8, 2014 Bankr. LEXIS 2138, at *21 (Bankr. E.D. Va. May 12, 2014).

**Conclusion**

Applying the Lowest Intermediate Balance Rule, the Court finds that the Liquidating Trustee has proven that the Defendant received funds in the amount of $569,435 that are directly traceable to the Avoided Transfers and/or Avoidable Transfers. The Court finds that Defendant has failed to meet its burden of establishing that it took the Avoided Transfers and/or Avoidable Transfers for value and, accordingly, is not entitled to protection under section 550(b) of the Bankruptcy Code. Finally, the Court holds that changed circumstances is not a defense to a claim arising under section 550(a) of the Bankruptcy Code. For these and all the other the reasons set forth herein, the Court will award judgment in favor of the Liquidating Trustee and against Defendant in the amount of $569,435. A separate Order shall issue.

Dated:   November 9, 2023                    /s/ Kevin R. Huennekens
                                              UNITED STATES BANKRUPTCY JUDGE

                                              Entered on Docket: November 9, 2023